

**FILED**

Feb 19 2019, 10:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: | February 19, 2019 |
| R.L.-P. (Minor Child) | Court of Appeals Cause No. 18A-JT-2083 |
| and | |
| M.E. (Father), | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Marilyn A. Moores, Judge |
| | The Honorable Scott Stowers, Magistrate |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | Trial Court Cause No. 49D09-1712-JT-1364 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, M.E. (Father), appeals from the trial court's Order terminating his parental rights to his minor child, R.L.-P. (Child).

We affirm.

# ISSUES

Father presents three issues on appeal, which we consolidate and restate as:

(1) Whether the trial court erred when it denied his motion to dismiss; and

(2) Whether the trial court's Order terminating his parental rights to Child was clearly erroneous.

# FACTS AND PROCEDURAL HISTORY

Child was born to Father and D.P. (Mother)[1] in March of 2016. On April 28, 2016, the Department of Child Services (DCS) filed a petition alleging that Child was a child in need of services (CHINS) based on allegations that Mother had failed to provide Child with a stable home free from substance abuse, Child's meconium had tested positive for marijuana at birth, Father had failed to demonstrate an ability or willingness to appropriately parent Child or to ensure her wellbeing while in Mother's care, and Mother reported that Father was abusing heroin. On June 20, 2016, Mother admitted that Child was a

---

[1] Mother's parental rights to Child were terminated in the same proceeding. Mother is not a party to the instant appeal.

CHINS due to Mother and Child testing positive for marijuana at the time of Child's birth. Father failed to appear for the CHINS fact-finding hearing, but after hearing evidence from the family case manager (FCM), the trial court found that Mother had reported domestic violence involving Father, DCS had only had two telephone contacts with Father, Father did not have stable housing, Father had not participated in services to address his substance abuse or domestic violence issues, Father had never appeared in court, and Father had not demonstrated an ability or willingness to parent Child. The trial court found that Child was a CHINS; however, Child remained in Mother's home, and Mother was ordered to engage in a number of services. On September 19, 2016, Child was removed from Mother's home due to safety concerns, and Child was placed in foster care where she has resided ever since.

[5] During the CHINS proceedings, Father was arrested for possession of methamphetamine. Father pleaded guilty and on December 7, 2016, was sentenced to time served. On February 28, 2017, Father committed the offense of conspiracy to commit robbery. He pleaded guilty to the offense and on December 13, 2017, was sentenced to nine years in the Department of Correction (DOC), with five years suspended, and two years of probation.

[6] On May 1, 2017, the permanency plan for Child was changed from reunification to adoption due to Mother and Father's failure to comply with Child's case plan. On August 28, 2017, the trial court entered an order directing Father to submit to a buccal swab to establish paternity. On October 8, 2017, Child was moved into a pre-adoptive foster home, which was her final

placement. DNA results dated October 12, 2017, confirmed that Father was Child's biological father. DCS referred Father to Father Engagement services with Greg Hruby (Hruby). Father told Hruby that he felt that he was not capable of being a father to Child but that paternal Grandfather (Grandfather) was capable. After Father told Hruby that he wished Child to be placed with Grandfather, Hruby met with Grandfather in his home and eventually performed a home assessment. Father was unable to complete Father Engagement due to being transferred to another DOC facility which did not provide services.

[7] In December 2017, Grandfather attended a family-child team meeting for Child where he disclosed that he was unable to care for Child at that time, citing work schedule concerns. On December 21, 2017, DCS filed a petition seeking the termination of Father's parental rights to Child (TPR). Grandfather was referred for grandparent visitation in February of 2018. At an April 2018 family-child team meeting, Grandfather requested that Child be placed with him. Child's current foster family also attended the meeting. DCS interviewed Grandfather and Child's current foster family at the meeting, and after that interview, concluded that Grandfather had not been able to answer their questions as adequately as the foster family. DCS did not alter Child's placement. In March 2018, Child's foster family filed a petition to adopt her. After mediation in the TPR proceedings failed to produce an agreement, the TPR was set for a two-day trial on July 24 and July 25, 2018.

[8] On July 19, 2018, Father filed a motion to dismiss the TPR in which he averred that Mother and Father had executed consents for Grandfather to adopt Child. Father also averred that on July 10, 2018, Grandfather had filed a petition to adopt Child. Father argued that, in light of his consent to adoption and the filing of Grandfather's adoption petition,

> [i]t is not necessary to have a trial to prove that termination is in the best interests of [Child] or that there is a satisfactory plan for the care and treatment of [Child]; both parents agree that this is the case. The only dispute remaining in this matter is whether one plan (Paternal Grandfather's home) or another (foster parents' home) is more appropriate for [Child]; however, this [c]ourt is not the proper venue to resolve that dispute.

(Appellant's App. Vol. II, p. 72). In its response to Father's motion to dismiss, DCS averred that Grandfather did not request placement until April 9, 2018, and that the consents that Mother and Father had executed were insufficient because Child's name was misspelled and her date of birth was not provided. The trial court denied Father's motion to dismiss without entering findings or conclusions.

[9] On July 24, 2018, the trial court held the TPR hearing. Mother did not appear, but Father appeared by teleconference and by counsel. Father's counsel renewed the motion to dismiss, commenting that

> [a]t this point in time, my client doesn't have a case to present with respect to the termination of parental rights because he has already consented to termination. The only issue at this point is placement . . . But, I don't think it's appropriate for this [c]ourt to

have a hearing about placement today.  I think that is a matter
for the adoption court.

(Transcript p. 8).  The trial court denied Father's renewed motion to dismiss,
finding that DCS was not required to accept Father's consent to adoption, DCS
appeared to have a satisfactory plan for Child—adoption—and that it was for
the adoption court to decide appropriate placement for Child.

[10]     As of the TPR hearing, Father had not seen Child for approximately one and
one-half years.  Father was studying for his high school equivalency
examination.  Father's projected release date was February 28, 2020.  After his
release, Father planned to live with Grandfather.

[11]     The FCM testified that neither parent had worked toward establishing a
relationship with Child and that termination of parental rights and adoption by
Child's current foster family was in her best interests because the home was free
of abuse and neglect, Child experienced consistent relationship and routines
there, Child's hygiene and developmental milestones were being met, and her
foster family functioned well which ensured permanency.  Child's guardian *ad*
*litem* (GAL) testified that child was well-bonded with her foster family, was
well-integrated into their home, and that she was having all of her needs met.  It
was the GAL's opinion that Child required permanency because she had been
in three foster homes and needed stability.  The GAL felt that termination was
in Child's best interests because the efforts made toward reunifying Child with
her biological parents had not been successful and Child deserved lifelong

stability. Child's foster mother testified regarding Child's daily routine and her bond with the family, including her foster brothers.

[12] On August 6, 2018, the trial court issued its Order terminating Father's parental rights to Child and entering the following relevant findings of fact and conclusions of law:

> 39.  There is a reasonable probability that the conditions that resulted in the removal and continued placement of [Child] outside the home will not be remedied by [Father]. [Father] will remain unavailable for another year and one-half. He will then have to address concerns, stay out of jail, and obtain stability.

> 40.  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a barrier to obtaining permanency for her through an adoption when [Mother] has stopped services and parenting time, and [Father] remains unavailable to parent and offer permanency.

> 41.  [Child] is in a [pre-adoptive] foster placement where she has resided since October of 2017. She has bonded with her caregivers and family, and enjoys a consistent routine. Her needs are being met as demonstrated in the developmental progress she has made since resided [sic] in this placement.

> * * *

> 43.  [Child's] [GAL] recommends adoption for [Child] and has observed her as being very bonded with her [pre-adoptive] family.

44. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met. She has become bonded with her foster family while [Mother] has not made herself available to form a bond and [Father] has also done so through criminal activity.

45. There exists a satisfactory plan for the future care and treatment of [Child], that being adoption.

(Appellant's App. Vol. II, pp. 17-18).

Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Motion to Dismiss*

Father argues that the trial court erred when it denied his motion to dismiss the TPR because he and Mother were willing to consent to Child's adoption by Grandfather. DCS counters that Father "is not a designated party who may file a motion to dismiss pursuant to I.C. § 31-35-2-4.5(d)." (Appellee's Br. p. 15). As such, resolution of Father's argument will entail examination of that statute. "We interpret statutes *de novo*." *Z.B. v. Ind. Dep't of Child Servs.*, 108 N.E.3d 895, 898 (Ind. Ct. App. 2018), *trans. denied*. However, before interpreting a statute, we consider whether the legislature has spoken clearly and unambiguously on the point in question. *Id*. If a statute is clear and unambiguous, it leaves no room for judicial construction and simply requires that we take words and phrases in their plain, ordinary, and usual sense. *Id*.

Indiana Code section 31-35-2-4.5 provides for the filing of TPRs. Subsection (d) states in relevant part, "A person described in section 4(a) of this chapter may file a motion to dismiss the petition to terminate the parent-child relationship if any of the following circumstances apply . . ." Indiana Code section 31-35-2-4(a) provides that

> A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile or probate court by any of the following:
>
> > (1) The attorney for the department.
> >
> > (2) The child's court appointed special advocate.
> >
> > (3) The child's guardian [*ad litem*].

Father does not contend that the statute is ambiguous, and we do not find it to be so. Reading these two unambiguous sections of the TPR statute together and giving their terms their plain, ordinary, and usual sense, reveals that only a DCS attorney, a child's court appointed special advocate, or a child's GAL may file a motion to dismiss a TPR. Thus, Father was not authorized by the TPR statute to file his motion, and we likewise find no basis in the statute for the trial court to have *sua sponte* dismissed the TPR, as Father urges in his Reply Brief. We conclude that the trial court did not err when it denied Father's motion to dismiss which Father was not authorized to file.

## II. *Termination of Father's Parental Rights*

The remainder of Father's argument on appeal is essentially that termination was not warranted because Child could have and should have been placed with

Grandfather during the CHINS proceeding, thus avoiding the need to terminate Father's parental rights. It is well-settled that when reviewing the evidence supporting the termination of parental rights we neither reweigh the evidence nor determine the credibility of witnesses. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). In addition, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn from that evidence. *Id.* "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.* We must give due regard to the trial court's opportunity to judge the credibility of witnesses firsthand, and we do not set aside the trial court's findings or judgment unless it is clearly erroneous. *Id.* "Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 93 (Ind. Ct. App. 2014) (quotation omitted).

[17] "[O]ne of the most valued relationships in our culture" is that between a parent and his or her child. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied.* Indeed, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, parental interests are not absolute; rather, termination of parental

rights is appropriate when parents are unable or unwilling to meet their parental responsibilities. *In re A.B.*, 887 N.E.2d 158, 164 (Ind. Ct. App. 2008).

[18] Termination of parental rights is an extreme sanction that is intended as a "last resort" and is available only when all other reasonable efforts have failed. *C.A.*, 15 N.E.3d at 91. As such, before a termination of parental rights is merited, the State is required to prove a host of facts by clear and convincing evidence, the most relevant for our purposes being that termination is in the best interests of the child and that there is a satisfactory plan for the child's care and treatment. Ind. Code §§ 31-35-2-4(b)(2)(C), (D); 31-37-14-2.

## A. *Child's Best Interests*

[19] Father contends that the evidence did not support the trial court's conclusion that termination of his rights was in Child's best interests. Our supreme court has recently recognized that one of the most difficult aspects of a termination of parental rights determination is the issue of whether the termination is in the child's best interests. *E.M.*, 4 N.E.3d at 647 (noting that the question "necessarily places the children's interest in preserving the family into conflict with their need for permanency"). The trial court's determination that termination was in the child's best interests requires it to look at the totality of the evidence of a particular case. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. "In doing so, the trial court must subordinate the interests of the parents to those of the children involved." *Id.*

[20] Here, Father was incarcerated for all but three or four weeks of the underlying CHINS case and the instant TPR proceedings and was not available to parent Child.[2] Before he was incarcerated, Father was not employed, had not addressed the substance abuse and domestic violence issues that came to light during the CHINS case, and had not established paternity for Child. There was no evidence in the record that Father had engaged in any programs to address those issues or better himself during his incarceration, apart from studying for his high school equivalency examination. As of the TPR hearings, Father had not seen Child for approximately one and one-half years, and he would not be available to parent Child until February 2020.

[21] Child, who had been in her pre-adoptive foster care placement since October 2017, was thriving there and was well-bonded with her foster family. Child's FCM and GAL felt that Child, who had been in three foster homes, needed permanency and that it was in her best interests that Father's rights be terminated. Given the totality of this evidence that supports the trial court's Order, we cannot conclude that the trial court's conclusion was clearly erroneous. *See D.D.*, 804 N.E.2d at 267; *E.M.*, 4 N.E.3d at 642.

[22] Father does not dispute the evidence supporting the trial court's judgment. Indeed, at the TPR hearing, Father took the position that termination was a

---

[2] There is evidence in the record that after paternity was established, Father moved the trial court for parenting time while incarcerated. The portion of the trial court's order which may have revealed the trial court's rationale for denying that request has been redacted.

foregone conclusion because he had already consented to it in order to facilitate Child's adoption by Grandfather. On appeal, however, Father argues that termination was not in Child's best interests because Child should have been placed with Grandfather during the CHINS proceedings. In support of his argument, Father relies on portions of the CHINS statute that mandate that a relative or *de facto* custodian be considered for placement upon removal and DCS's internal policy statements favoring engagement of relatives in CHINS proceedings.

[23] Even if we were to assume, without deciding, that these were relevant considerations for the TPR court, Father's argument overlooks that paternity was not established until October 2017, approximately one and one-half years after the CHINS proceedings were initiated and a little over a year after Child was actually removed from Mother's care. Thus, Grandfather had no legal status in Child's life until that time, and there was no evidence that Grandfather had any previous contact or bond with Child or that he was even willing to foster Child during the early stages of the CHINS proceedings. Around the time paternity was established, Child's previous foster home had decided against adoption, and so DCS sought another placement. Grandfather attended a DCS meeting in December 2017 where he disclosed that he was unable to have Child placed with him at that time. Child had been placed with her current pre-adoptive home in October 2017, and so at a time when she potentially could have been transitioned to Grandfather's home with a minimum of extra disruption, Grandfather was unable or unwilling to take

Child.  Instead, Child stayed in her pre-adoptive placement where she bonded with her foster parents and brothers, thrived, and became integrated into the home.  When Grandfather requested in April 2018 that Child be placed with him, he was interviewed along with Child's current foster family, who, at that juncture, was assessed by DCS to be the better placement for Child.  In light of these facts and circumstances, we find no error, let alone error that firmly convinces us that a mistake has been made, in the trial court's conclusion that termination was in Child's best interests.  *See C.A.*, 15 N.E.3d at 93.

## B.  *Satisfactory Plan*

[24]  Father also briefly asserts that no satisfactory plan existed for Child's care and treatment.  "In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child."  *D.D.*, 804 N.E.2d at 268.  The plan for care and treatment need not be detailed if it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.  *Id.*  Generally, adoption is a satisfactory plan.  *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008).

[25]  Here, the permanency plan for Child was adoption.  This was a suitable and adequate plan to support termination.  *Id*.  Nevertheless, Father argues that it was an inadequate plan in this case because DCS failed "to follow the dictates of statute and its own written policies with respect to [Child's] placement and possible adoption." (Appellant's Br. p. 28).  We have already found Father's arguments regarding Child's placement to be unavailing, and Father fails to

identify any statutes or written DCS policies pertaining to adoption violated by DCS in this case. We also note that Father acknowledged at the TPR hearing that it was for the probate court to determine who adopted Child, not the TPR court. *See* I.C. § 31-19-1-2(b) (providing that for counties that have a separate probate court, "[t]he probate court has exclusive jurisdiction in all adoption matters.").

[26] Inasmuch as Father appears to insinuate in other parts of his Brief that there was something irregular or improper about the GAL in this case bringing Child's final, pre-adoptive foster family to the attention of DCS, we find that concern to be ungrounded. The GAL testified at the TPR hearing that she knew the foster family because they had fostered another child in her caseload who was going home, so the GAL knew they would have a vacancy in their home. The GAL was not friends with the family and had no other contact with them prior to the other case. Concluding that DCS had a plan of adoption for Child, we find that the trial court's conclusion that a satisfactory plan existed for Child's care and treatment was not clearly erroneous. *See E.M.*, 4 N.E.3d at 642.

## CONCLUSION

[27] Based on the foregoing, we conclude that the trial court did not err when it denied Father's motion to dismiss the TPR and that the trial court's TPR Order was not clearly erroneous.

[28] Affirmed.

[29]    Kirsch, J. and Robb, J. concur