## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 18 2019, 9:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances H. Barrow
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

Dawn Rauch
Certified Legal Intern
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of S.M., Mother, C.M., Father, and A.M. and B.M.M., Minor Children, | December 18, 2019 |
| | Court of Appeals Case No. 19A-JT-312 |
| | Appeal from the Jennings Circuit Court |
| | The Honorable Jon W. Webster, Judge |
| | Trial Court Cause Nos. 40C01-1809-JT-32 40C01-1809-JT-33 |

S.M.,[1]

*Appellant-Respondent,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Kirsch, Judge.**

[1] S.M. ("Mother") appeals the juvenile court's order terminating her parental rights to her children A.M. and B.M.M. (together, "Children"), raising the following restated issue: whether the trial court's legal conclusion that it was in Children's best interests to terminate Mother's parent-child relationship was supported by clear and convincing evidence.

[2] We affirm.

---

[1] We note that the juvenile court also terminated Father's parental rights to A.M. and B.M.M. While Father does not participate in this appeal, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court is a party on appeal.

## Facts and Procedural History[2]

[3] Mother and C.M. ("Father") are the parents of A.M., born October 20, 2015, and B.M.M., born September 29, 2016.[3] *Tr. Vol. II* at 5. On or about September 22, 2016, one week prior to B.M.M.'s birth, a caller to the Indiana Department of Child Services ("DCS") hotline reported concern for the safety of A.M. Specifically, the caller alleged that Father had been hospitalized due to an infection from intravenous drug use, Mother and Father ("Parents") were using drugs, and Mother was pregnant. *Id.* at 6; *Appellant's Conf. App. Vol. 2* at 25, 31. The caller was concerned that A.M. was not being cared for. *Tr. Vol. II* at 6. The call prompted DCS to look for Parents; however, Parents could not be found at that time.[4] *Appellant's Conf. App. Vol. 2* at 26.

[4] On October 4, 2016, DCS received a second call concerning the safety of A.M.'s infant sibling, B.M.M. B.M.M., who was born to Mother four weeks early and was experiencing symptoms of drug withdrawal, had been in the neonatal intensive care unit of a Kentucky hospital ("the Hospital") since her September 29, 2016 birth. *Tr. Vol. II* at 6; *Appellant's Conf. App. Vol. 2* at 26, 31.

---

[2] Because Mother does not challenge the juvenile court's findings, our facts rely heavily on the findings in the juvenile court's January 10, 2019 order. *Appellant's Conf. App. Vol. 2* at 30-37.

[3] Mother's and Father's parental rights to A.M. and B.M.M. were terminated at the same time; however, because Father does not participate in this appeal, we recite only those facts necessary to address Mother's appeal.

[4] Mother reported that she lived in Kentucky prior to DCS involvement, and gave birth to B.M.M. in Kentucky, but she was visiting her seven-year old son in Indiana when DCS first became involved. *Appellant's Conf. App. Vol. 2* at 26. Mother did not have custody of her son. *Id*.

The caller reported that Mother had tested positive for amphetamines and benzodiazepines in July 2016, while pregnant, and that "her prenatal care had been sporadic." *Appellant's Conf. App. Vol. 2* at 26. It was later discovered that Mother had attended only three prenatal visits during her pregnancy. *Id.* at 32. The caller also stated that Mother had a history of heroin and methamphetamine use. *Id.* at 26, 32.

[5] In response to that call, Elizabeth Beesley ("FCM Beesley"), a DCS family case manager, visited B.M.M. in the Hospital on October 4, 2016. *Tr. Vol. II* at 6. FCM Beesley learned that Mother had been using methamphetamine, heroin, and Subutex during her pregnancy and that a screen of B.M.M.'s meconium "tested positive for Subutex." *Appellant's Conf. App. Vol. 2* at 26. Mother did not have a valid prescription for Subutex at that time. *Id.* FCM Beesley also learned that Mother did not have stable housing or a legal source of income, and that Parents had been seen outside the Hospital "trying to sell some of the belongings that the [H]ospital had given them, car seat, clothing, diapers, things like that." *Tr. Vol. II* at 6; *Appellant's Conf. App. Vol. 2* at 26, 32. Furthermore, Parents had brought a homeless man into the Hospital's neonatal intensive care unit, where B.M.M. was receiving care, so that the man could shower and get food and a blanket and pillow. *Appellant's Conf. App. Vol. 2* at 26, 32.

[6] The Hospital staff reported that, earlier in B.M.M.'s stay, security had escorted Parents out of the Hospital after it was discovered that Parents had stolen hospital supplies, including syringes. *Id.* at 26, 32. Thereafter, Parents' visits with B.M.M. were limited to supervised visits between the hours of 8 a.m. to 8

p.m. *Tr. Vol. II* at 7. On October 4, 2016, the Hospital notified DCS that B.M.M. was ready to be discharged, but Parents could not be located. *Id.* at 10; *Appellant's Conf. App. Vol. 2* at 26. Therefore, due to Parents' absence and DCS's concerns regarding Parents' substance abuse, DCS took custody of B.M.M. *Appellant's Conf. App. Vol. 2* at 26.

[7] FCM Beesley's first encounter with Mother occurred at the Hospital on October 5, 2016; Mother told FCM Beesley that A.M. had been living with Mother's sister. *Tr. Vol. II* at 8-9. In fact, A.M. had been living with Mother's sister for "a couple of months." *Id.* at 9. When DCS went to check on A.M., Mother's sister was not cooperative; she did not let DCS personnel enter her home and said that A.M. was with a babysitter. *Appellant's Conf. App. Vol. 2* at 26. Mother's sister refused to provide the name or address of the babysitter. *Id.* That same day, Mother and her sister contacted DCS and agreed to meet with DCS staff and bring A.M. with them. *Id.* At that time, Mother's sister tested positive for cocaine and was ruled out as a placement option for Children. *Id.* DCS, therefore, took custody of A.M. on October 5, 2016 and placed Children together in a foster home. *Id.*

[8] On October 6, 2016, DCS filed a petition as to each of the Children, stating that each was a child in need of services ("CHINS").[5] *Exs. Vol. III* at 11-14, 40-43.

---

[5] The CHINS petitions for B.M.M. and A.M. were filed in Jennings County under Cause Numbers 40C01-1610-JC-110 and 40C01-1610-JC-111, respectively. B.M.M. was born in Kentucky, and Parents provided Hospital staff with three different addresses, two in Kentucky and one in Indiana. Only one of those

The CHINS petitions alleged that each child's physical or mental condition was seriously impaired or endangered because of Parents' "inability, refusal, or neglect" to supply Children with "necessary food, clothing, shelter, medical care, education, or supervision." *Id*. at 11, 40. B.M.M.'s CHINS petition further alleged that she was born with a controlled substance in her system. *Id*. at 40. An initial hearing was held on October 6, 2016, at which Parents appeared and denied the allegations. The CHINS court continued DCS's custody of Children. *Appellant's Conf. App. Vol. 2* at 32.

[9] In November 2016, DCS learned that Mother had been arrested in Kentucky on two bench warrants for burglary and shoplifting. *Id*. In March 2017, Mother called DCS and stated that she was living in Kentucky and had no way to get to Indiana to visit Children. *Id*. In June 2017, DCS learned that Father was incarcerated in a Kentucky jail for a burglary conviction. *Id*. FCM Beesley testified that between October 2016 and June 2017, a period of nine months, DCS had only one phone call from Mother; no other contact occurred. *Id*. Elizabeth Beatty ("FCM Beatty"), a family case manager assigned to the case from June 2017 through March 2018, testified that during her involvement it was extremely difficult for her to communicate with and locate Mother. *Id*. at 32-33. FCM Beatty also testified that Mother "burned through several visit providers due to her lack of compliance with visits, that Mother showed up

---

addresses was valid, a residence in Commiskey, Jennings County, Indiana. As such, the CHINS cases were deemed to be under Indiana jurisdiction. *Tr. Vol. II* at 8.

unprepared for visits, and that Mother exhibited an overall lack of motivation in the case." *Id.* at 33.

[10] Mother completed her first substance abuse assessment with Centerstone on August 8, 2017,[6] after her case had been open for ten months. *Id.* Sierra Rogers ("Rogers"), a Centerstone employee who worked as a liaison with DCS, recommended that Mother work with a recovery coach and participate in individual therapy. *Tr. Vol. II* at 45-46; *Appellant's Conf. App. Vol. 2* at 22. Rogers testified that Mother never engaged in those services, and the referral was closed in January 2018. *Tr. Vol. II* at 46.

[11] After numerous continuances, a fact-finding hearing for the CHINS was held on January 9, 2018. At that time, Mother admitted to the CHINS allegations. *Id.* Accordingly, the CHINS court entered its order on February 5, 2018, adjudicating Children to be CHINS and setting forth provisional orders for Mother, pending further order of the court. *Exs. Vol. III* at 24. A dispositional hearing was held on February 15, 2018, and Mother agreed to the CHINS court's recommendations. On March 1, 2018, the CHINS court's dispositional order kept Children in DCS's care and custody and ordered Mother to (1) complete a parenting assessment and follow all recommendations, (2) complete a substance abuse assessment and follow all recommendations, (3) attend all scheduled visitation with Children, (4) maintain regular contact with the family

---

[6] Sierra Rogers, a Centerstone employee, stated that the first drug assessment was performed on July 14, 2017. *Tr. Vol. II* at 45.

case manager, (5) maintain safe and suitable housing, (6) secure and maintain a legal and stable source of income, and (7) comply with random drug screens. *Appellant's Conf. App. Vol. 2* at 33; *Exs. Vol. II* at 55-57.

[12] Meanwhile, in February 2018, Mother was referred to Amy Elliott ("Elliott"), a therapist and supervisor with Ireland Home Based Services. Elliott oversaw the Ireland employees who were present during Mother's visits with Children. In May 2018, Elliott changed Mother's visits from two visits per week to one visit per week due to reports that Mother's irregular transportation was resulting in inconsistent visits. *Tr. Vol. II* at 36; *Appellant's Conf. App. Vol. 2* at 27, 33. At that time, Mother was also placed on "call ahead," meaning she had to confirm in the morning that she would be attending a visit later that same day. *Tr. Vol. II* at 36-37; *Appellant's Conf. App. Vol. 2* at 33. Elliott noted that Mother's visits improved after she obtained transportation; Mother came prepared and showed a bond with Children as they did with her. *Id.* at 37, 39. Mother admitted that she tested positive for methamphetamine and amphetamine on May 31, 2018. *Tr. Vol. II* at 56; *Appellant's Conf. App. Vol. 2* at 33. Elliott testified that visitation between Mother and Children was suspended in June 2018 after Mother left Indiana and missed over a month of visits.[7] *Tr. Vol. II* at 37-38; *Appellant's Conf. App. Vol. 2* at 33. On July 2, 2018, Mother was arrested and charged with

---

[7] "In May of 2018, [Mother] reported she was out of state because her father passed away in Florida and she was not able to attend any visits. [Mother] attended one visit in June 2018, after which time visits were placed on hold until [Mother] would meet with [DCS]." *Appellant's Conf. App. Vol. 2* at 27.

unlawful possession of a legend drug and possession of a controlled substance; a jury trial was set for March 2019.[8] *Appellant's Conf. App. Vol. 2* at 34.

[13] On July 10, 2018, Mother completed her second substance abuse assessment through Centerstone. Centerstone again recommended that Mother work with a recovery coach and participate in individual therapy. *Id*. at 28, 34. As of the November 2018 fact-finding hearing, Mother had not completed any type of substance abuse treatment. *Id*. at 34. On July 24, 2018, Mother tested positive for THC and Xanax. *Id*. Mother had no prescription for Xanax. *Id*. On July 30, 2018, Mother again tested positive for THC. *Id*. In a September 4, 2018 order, DCS changed its plan of reunification of Children and Mother to adding a concurrent plan of adoption. *Exs. Vol. III* at 59; *Appellant's Conf. App. Vol. 2* at 11. On September 11, 2018, Mother tested positive for THC. *Appellant's Conf. App. Vol. 2* at 34. On September 21, 2018, Mother, citing medical issues, asked FCM Beesley to administer a drug screen at Mother's home. Mother, however, was not home to meet FCM Beesley for the appointment. *Id*. Mother did not provide any written medical excuse for her absence. *Id*. Mother tested positive for THC on September 25, 2018 and again on November 11, 2018.[9] *Id*. On

---

[8] At the time of the November 26, 2018 fact-finding hearing, Mother's charges under 40C01-1808-F6-260 were still pending.

[9] Mother testified that the positive indication for the presence of THC must have been a mistake because she had not smoked marijuana. *Tr. Vol. II* at 77. Instead, Mother said that she had been around her fiancé who smoked marijuana. *Id*. DCS asked whether Mother was aware of the testimony of forensic fluid scientists who said that, in their opinion, the level of THC demonstrated that Mother must have "ingested or consumed the drug." *Id*. at 78. Mother acknowledged that she was aware of that testimony. *Id*.

September 25, 2018, DCS filed two essentially identical petitions, one for each child, to terminate the parental rights ("TPR") of Mother. *Appellant's Conf. App. Vol. 2* at 10-12; *Appellant's Conf. App. Vol. 3* at 12-14.

[14] The juvenile court held a TPR fact-finding hearing on November 26, 2018 and heard testimony from witnesses FCM Beesley, Elliott, FCM Beatty, Rogers, and Laural French, the guardian ad litem ("the GAL"). FCM Beesley testified: (1) in 2018 alone, Mother was a "no show" for at least ten of her 2018 random drug screens, and under the terms of the dispositional decree, failure to appear was deemed to be a positive screen, *tr. vol. II* at 15; (2) Mother did not complete the required parenting assessment, *id*. at 13-14; and (3) Mother had numerous opportunities to address her drug addiction during the CHINS and TPR proceedings, a period of over two years, yet tested positive for illegal substances just two weeks before the TPR hearing, *id.* at 30; and (5) the permanency plan of adoption was in Children's best interest, *id*. at 32. Rogers testified: (1) Mother attended four out of nine scheduled appointments with a Centerstone recovery coach but, of the five missed appointments, three were in November 2018, the month of the TPR hearing, *id*. at 47; and (2) Mother was non-compliant with most of her services and lacked motivation, *id*. at 44. The GAL testified that Mother lacked motivation when working with the Centerstone recovery coach. *Id*. at 82-83.

[15] At the close of the hearing, the juvenile court took the matter under advisement, and on January 10, 2019 entered its order terminating Mother's parental rights to Children. *Appellant's Conf. App. Vol. 2* at 31. The juvenile court found: (1)

there were periods of time when Mother did not contact DCS for months at a time; (2) Mother regularly "no-shows" for drug screens and missed at least four Child and Family Team Meetings, one of which was just one month before the termination fact-finding hearing; (3) Mother has never completed any services and shows a lack of consistency and follow through; (4) Mother participates in only one DCS-provided service, visitation; (5) DCS has never been able to recommend that Mother have unsupervised time with Children or that either child be placed back in Mother's care; (6) Mother has not satisfactorily addressed her substance abuse issues, nor has she consistently engaged in services for any meaningful amount of time in the over two years since the case has been open. *Id.* at 34-35.

[16] The juvenile court, upon finding that DCS had established by clear and convincing evidence that the allegations in the TPR petitions were true, concluded that: (1) Children had been removed from Mother for at least six months under a dispositional decree; (2) it is unlikely that the conditions that led to the removal of Children from Mother's care will be remedied; (3) termination of Mother's parental rights is in Children's best interest; and (4) DCS has a satisfactory plan for Children, adoption. *Id.* at 31-36. Mother now appeals.

## Discussion and Decision

[17] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the

trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child, and parental rights are of a constitutional dimension, we may terminate those rights when a parent is unable or unwilling to meet her responsibilities as a parent. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[18] Thus, parental rights are not absolute and must be subordinated to the child's best interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.* The purpose of terminating parental rights is not to punish the parent but to protect the child. *Z.B. v. Ind. Dep't of Child Servs.*, 108 N.E.3d 895, 902 (Ind. Ct. App. 2018), *trans. denied*. The juvenile court need not wait until the child is irreversibly harmed, such that her physical, mental, and social development is permanently impaired, before terminating the parent-child relationship. *Id.* at 903. The court must judge a parent's fitness to care for her child at the time of the termination hearing. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. However, requiring trial courts to give due regard to changed conditions "does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *E.M.*, 4 N.E.3d at 643.

[19] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Z.B.*, 108 N.E.3d at 900. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App.

2009). Where, like here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will not set aside the court's judgment terminating a parent-child relationship unless it is clearly erroneous. *H.L.*, 915 N.E.2d at 148-49. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S.*, 987 N.E.2d at 1156.

[20] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> . . . .
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months . . .;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

. . . .

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. If the juvenile court finds that the allegations in a petition are true, it shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[21] Mother does not contest the accuracy of the juvenile court's specific factual findings. Accordingly, we must accept those findings as true. *See In re S.S.,* 120 N.E.3d 605, 610 (Ind. Ct. App. 2019) (citing *McMaster v. McMaster,* 681 N.E.2d 744, 747 (Ind. Ct. App. 1997)) (where factual findings are not challenged, court on appeal must accept findings as true). If the unchallenged findings support the court's legal conclusions, then this court must affirm the juvenile court's judgment. *See T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) ("[B]ecause the trial court's unchallenged findings clearly and

convincingly support its ultimate decision to terminate Mother's parental rights to [children], we find no error."), *trans. denied*.

[22] Mother, likewise, does not contest the juvenile court's conclusions that: (1) Children have been removed from Mother's care for at least six months under a dispositional order; (2) there is a reasonable probability that the conditions that resulted in Children's removal from Mother will not be remedied;[10] and (3) adoption is a satisfactory plan for the care and treatment of Children.[11] *Appellant's Br.* at 10-11. Instead, Mother's sole argument on appeal is that DCS did not meet its burden of proving under Indiana Code section 31-35-2-4(b)(2)(C) that termination is in the best interest of Children. *Appellant's Br.* at 10, 14.

[23] "Our supreme court has recently recognized that one of the most difficult aspects of a termination of parental rights determination is the issue of whether the termination is in the child's best interests." *R.L.-P.*, 119 N.E.3d 1098, 1104-

---

[10] Mother does not agree that (1) it is likely that the reasons for Children's removal will not be remedied and (2) maintaining the parent-child relationship will be detrimental to Children. *Appellant's Br.* at 11. Even so, "she is forced to concede there is direct evidence in the record supporting the trial court's findings . . . because [C]hildren were removed as a result of Mother's substance abuse issues." *Id*. Furthermore, Mother concedes that "DCS presented evidence that Mother had only recently addressed her substance abuse issues and had missed recent appointments for therapy." *Id*. "Both the DCS case worker and the GAL testified that the reason for removal was not remedied and that Mother's substance abuse could endanger the children." *Id*. "Again, Mother does not agree or concede that the trial court's findings are accurate, but, for the purposes of [a]ppeal, no separate argument is raised on this issue." *Id*.

[11] DCS alleges the satisfactory plan is to attempt to find suitable parents to adopt Children. *Appellant's Br.* at 10. Arguing that "the approval of a boilerplate undetailed care plan seems to fly in the face of the statutory requirement of clear and convincing evidence," Mother, nevertheless, concedes that the "plan for care" element of the statute has been legally satisfied. *Id*. at 11.

05 (Ind. Ct. App. 2019) (citing *E.M.*, 4 N.E.3d at 648 (recognizing that conflict exists between a child's interest in family preservation and need for permanency)). A trial court's decision that termination was in the child's best interests requires it to look at the totality of the evidence of a particular case. *In re S.K.*, 124 N.E.3d 1225, 1234 (Ind. Ct. App. 2019), *trans. denied*. "In so doing, the court must subordinate the interests of the parents to those of the child involved." *Id*. "Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened." *Id*. "The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *Id.* Furthermore, the testimony of the service providers may support a finding that termination is in the child's best interests. *Id*. (citing *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[24] Mother argues that a parent's failure to complete each element of a dispositional decree is not sufficient to demonstrate termination is in the best interest of Children. *Appellant's Br.* at 11. Mother contends that she has made "marked and consistent improvement" over the course of the CHINS and termination proceedings. *Id*. at 12. While admitting that she initially failed to comply with the dispositional order to maintain consistent contact with FCM Beesley, address her substance abuse, and participate in parenting time, Mother asserts that she was able to address her transportation issues and that her visitation with Children improved in 2018. *Id.*

[25] Explaining the initial erratic nature of her visits with Children, Mother argues that she had no choice but to put visitation of Children on hold while she was in Florida for three or four weeks after her father died in late April 2018. *Id*. Mother explains that her visits with Children were reinstated when she returned from Florida and that the supervisor of the visitation reported that, since June 2018, visits have "go[ne] well." *Id*. (citing *Tr. Vol. II* at 39). The visitation supervisor said that Mother is prepared for the visits and minimal intervention is needed. *Tr. Vol. II* at 39. Children enjoy seeing Mother, with whom Children have a bond. *Id*.

[26] We find that Mother's improvement in visiting Children is commendable, yet more consistent visitation alone is not enough to support Mother's claim that it is not in the best interest of Children to terminate Mother's parental rights. Factors other than visitation do not reflect well on Mother. For instance, A.M. was removed from Mother's care because Mother did not have stable housing or a legal source of income and left A.M., for months, in the care of Mother's sister, who tested positive for cocaine. *Appellant's Conf. App. Vol. 2* at 32. B.M.M. was removed from Mother's care because B.M.M. was born with drugs in her system, and Mother could not be found at the time of B.M.M.'s discharge from the Hospital. *Id*. at 31-32. Mother had more than two years to work toward reunification with Children. During the first nine months after Children were removed, Mother had little or no contact with DCS. *Id*. at 32. Mother was inconsistent and unmotivated in attending therapy and working with her recovery coach. *Id*. at 33, 34. In fact, Mother missed three scheduled

appointments during the month of the TPR hearing. *Id.* at 34. Furthermore, Mother missed numerous drug screens and tested positive for THC as late as the month of the TPR hearing. *Id.* at 34. Mother never completed any of the services and exhibited a lack of follow through and a lack of consistency. *Id.* at 35.

[27] FCM Beesley testified that it would not be in Children's best interest to give Mother more time to complete services; instead, she believed it was in Children's best interest to terminate Mother's parental rights. *Tr. Vol. II* at 32, 83. The GAL also believed that termination was in the best interest of Children because after two years "we're no where [sic] near closer to being able to place them with either parent." *Id.* at 83. "[R]ecommendations by the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 133 N.E.3d 707, 716 (Ind. Ct. App. 2019).

[28] In finding that it was in the best interests of Children to terminate Mother's parental rights, the juvenile court cited the following reasons:

> 1. Both parents have failed to address their substance abuse issues.

> 2. Both parents have failed to complete any services ordered by the Court.

3. Both parents have failed to communicate effectively with DCS during the course of this case.

4. Both parents have been incarcerated on and off throughout this case for various crimes.

. . . .

6. Parents have not enhanced their ability to safely and appropriately parent their children and are unable to provide the children with a safe, stable, and appropriate home free from substance abuse.

7. GAL Laural French and FCM Beesley do not believe it would be in [C]hildren's best interest to give Mother or Father more time to complete services and attempt to reunify with their children.

*Appellant's Conf. App. Vol. 2* at 36.

[29] As we have discussed above, the juvenile court's conclusions regarding best interest are supported by the evidence. By the juvenile court's own findings, DCS presented clear and convincing evidence that Mother continued to use illegal substances, failed to complete any services designed to address substance abuse and stability issues, and had made no significant sustained progress toward reunification. We are not unsympathetic to the difficulty parents face when attempting to reunite with their children. However, children cannot remain in limbo forever. The evidence before the juvenile court supported its conclusion that the termination of Mother's parental rights was in Children's

best interest. The juvenile court's termination of Mother's parent-child relationship with Children was not clearly erroneous.[12]

[30] Affirmed.

Baker, J., and Crone, J., concur.

---

[12] Mother contends:

> The practical effect of termination of the parent child relationship for the lives of these children is only the removal of a Mother who loves them and is bonded to them. [Children] will continue to reside with the same placement, they will continue to go to school in the same district, and they will continue to interact with the same friends. Termination in this case provides no extra stability, consistency, or assurance to these children. Termination only withdraws any assistance or services that can be afforded to Mother as she continues to get her life back in order. Termination cuts off a needed avenue of assistance to a person who is in a vulnerable transition.

*Appellant's Br.* at 12-13. Regardless of whether Mother is correct in her assertions, we remind her that the court focuses on the best interests of Children and not the parents.