## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 20 2020, 7:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.E., et al. (Minor Children) | August 20, 2020 |
| and | Court of Appeals Case No. 20A-JT-371 |
| K.E. (Father), | Appeal from the Switzerland Circuit Court |
| *Appellant-Respondent,* | The Honorable W. Gregory Coy, Judge |
| v. | Trial Court Cause Nos. 78C01-1903-JT-2 |
| The Indiana Department of Child Services, | 78C01-1903-JT-3 78C01-1903-JT-4 |
| *Appellee-Petitioner.* | 78C01-1903-JT-5 |

**Bailey, Judge.**

# Case Summary

[1] K.E. ("Father") appeals the termination of his parental rights, challenging the sufficiency of the evidence supporting termination. We affirm.

# Facts and Procedural History[1]

[2] Father and T.C. ("Mother") had four children together, J.E. (born June 2010); T.E. (born November 2011); Ky.E. (born September 2013); and R.E. (born December 2016) (collectively, the "Children").[2] In November 2017, the Switzerland County Department of Child Services ("DCS") filed a petition alleging that the Children were Children in Need of Services ("CHINS") due to neglect. At that time, Mother was caring for the Children while Father was incarcerated on a probation violation after having served time for a forgery conviction. DCS alleged that Father had a projected release date of October 2018. DCS further alleged that it had opened an Informal Adjustment with the family in October 2017 and that Mother tested positive for methamphetamine.

[3] Father admitted that the Children were CHINS because he was "unable to care for the [C]hildren due to his incarceration." Ex. Vol. 3 at 50. The trial court

---

[1] The 173-page transcript in this case contains more than eighty instances of inaudible testimony. *See, e.g.*, Tr. Vol. 2 at 75 ("Q: What is your opinion based on whether or not the situations will be remedied that gave rise to this case? A: [. . .] I don't feel like they have been remedied and I don't feel that . . . inaudible . . . [.]"). The issue is not isolated to a single speaker or day of fact-finding, suggesting a possible ongoing issue in the courtroom. Although our review was not impeded, we bring this issue to the attention of the trial court.

[2] Mother passed away during the pendency of proceedings below.

held a dispositional hearing and ordered Father to participate in services. The court's February 2018 order required Father to—*inter alia*—(1) obey the law; (2) maintain suitable and stable housing; (3) refrain from using illegal substances; and (4) participate in drug screens. Under the order, the Children remained in the care of their paternal grandmother, D.R. ("Grandmother"), with whom Mother had been living when DCS opened the Informal Adjustment.

[4] In July 2018, Father filed a motion seeking permission to reside with the Children. Father alleged that he anticipated being released from prison and intended to reside with Grandmother. The court granted the motion. A few weeks later, DCS moved to have the Children placed with Father on a trial home visit. DCS alleged that Grandmother had been arrested on allegations of domestic battery against Father and that she faced a felony charge that rendered her ineligible for placement. The court granted the motion on August 3, 2018.

[5] On September 24, 2018, DCS moved to terminate the trial home visit. DCS alleged that (1) a physical altercation reportedly occurred between Mother and Father; (2) Father denied using methamphetamine, then submitted a positive screen and admitted to using methamphetamine; and (3) Father failed to restrict Mother's access to the Children, which was a violation of the safety plan. The trial court granted the motion and the Children were placed in foster care.

[6] About two weeks after the Children were placed in foster care, Father was arrested. He later pleaded guilty to maintaining a common nuisance. Father was released in February 2019. Within an hour, he was arrested on allegations

of domestic violence against Mother. While incarcerated, Father engaged in fights and disruptive behavior, at one point requiring the use of a taser and restraint. He was also charged with battery in connection with an incident in the jail. Father was later transferred to a different jail due to safety concerns.

[7] Father "admit[ted] to having anger" issues. Tr. Vol. 2 at 149. Although Father worked with an outpatient therapist and a caseworker on controlling his anger, Father "struggled with being able to implement" the anger-management skills. *Id.* at 103. When asked whether he had "eight or nine incidents at the jail where [he] lost [his] temper and control," Father responded: "That's just me." *Id.* at 31. Father also felt that his behavior was misinterpreted: "I'm from Cincinnati, I'm not from here. Just a lot of the things here are different than where I'm from. The way I talk or how I do things, people take it as aggression and that's not how it is. In Cincinnati, that's who you are." *Id.* at 163.

[8] Mother reported to DCS that she and Father "had a history of using meth and of domestic violence." *Id.* at 139. The Children "reported that they have seen domestic violence incidents." *Id.* At one point, Father became angry during a meeting with a family case manager ("FCM"). Father began yelling. The FCM noticed that Father's face had turned red and "he was starting to shake." *Id.* at 135. The FCM felt threatened and ended the meeting. The FCM informed her supervisor that she did not feel comfortable meeting with Father because she "felt like something physical was going to happen." *Id.* at 136. After the meeting, the FCM was concerned about exposing the Children to Father's temper. The FCM noted that, in the past, the Children had expressed

to her "that they were afraid to visit with [Father]." *Id.* at 137. The oldest, J.E., was the most vocal about not wanting to visit Father, telling the FCM that "he didn't trust his dad and he thought he would get hurt again." *Id.*

[9] On March 20, 2019—approximately one month after Father had been arrested on a charge of domestic battery—DCS filed a petition to terminate parental rights. A fact-finding hearing commenced in September 2019. The hearing was continued due to health concerns regarding Mother, who later passed away.[3]

[10] Meanwhile, Father was released from jail and a supervised visit was scheduled for October 26, 2019. As a caseworker drove the Children to the visit, she observed tension among the Children. Some of the Children kept "making comments that they didn't want to go." *Id.* at 117. T.E. expressed concern that

---

[3] Around this time, the relationship between Father and his appointed counsel deteriorated to the point that counsel moved to withdraw. The trial court granted the motion on November 13, 2019. Although Father was responsible for delay in the appointment of successor counsel, the court ultimately appointed counsel on December 18, 2020—thirteen or so business days before fact-finding was scheduled to resume, and amid the holiday season. Counsel filed a motion for a continuance, seeking "additional time to prepare." Appellant's App. Vol. 2 at 113. The trial court denied the motion without explanation. On appeal, Father does not complain about the denial of the motion, and it appears that successor counsel ably defended Father. We write to emphasize that termination proceedings involve fundamental rights. *See, e.g.*, *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). In this case, stepping into an advocacy role—after evidence had already been presented—would require, *inter alia*, reviewing two years of case history as well as the transcript from the first day of fact-finding. Furthermore, the transcript indicates that DCS disclosed fifteen to eighteen potential witnesses, Tr. Vol. 2 at 2, and DCS had so far examined only five witnesses in presenting its case. It seems unlikely that this legal matter was the only matter entrusted to counsel at the end of 2019. In any case, to the extent the court denied the motion in light of a statutory deadline to complete a fact-finding hearing, *see* Ind. Code § 31-35-2-6(a)(2)—an issue discussed at times below—we observe that the case was already beyond that deadline. Moreover, as our Supreme Court recently clarified, a parent cannot claim error based on that deadline where a parent has invited the error. *See In re J.C.*, 142 N.E.3d 427, 432 (Ind. 2020) (noting that relief was not available to a parent "who affirmatively waived the 180-day statutory timeframe and thus invited any alleged error" in the belated completion of fact-finding). Therefore, even if granting the continuance would have been the sole cause of belated fact-finding, continuing the case would not have constituted reversible error. *See id.*

Father would "beat [him] up," at which point Ky.E. "chimed in and said, 'yeah, [Father] used to beat up [J.E.] and [T.E] but not me or [Ry.E].'" *Id.* at 118. With the help of the caseworker, a "safe word" was selected for use if the Children felt uncomfortable and wanted to terminate the visit. During that supervised visit—and during a supervised visit the next month—the caseworker did not observe a bond between the Children and Father. After those two visits, the caseworker recommended terminating further visitation with Father.

[11] The fact-finding hearing concluded in January 2020, and the trial court took the matter under advisement. At that point, Father was on parole and probation and was working to resolve pending criminal matters. He was employed and had his own bedroom in a residence he shared with family friends. Father believed that he was earning enough to consider getting his own residence.

[12] On January 15, 2020, the trial court entered a written order in which it terminated Father's parental rights to the Children. Father now appeals.

# Discussion and Decision

[13] When entering a judgment in a termination matter, the trial court must enter findings of fact. Ind. Code § 31-35-2-8(c). Pursuant to Trial Rule 52(A), we "shall not set aside the findings or judgment unless clearly erroneous" and shall give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." A finding is clearly erroneous if the record contains no evidence to support the finding. *Town of Brownsburg v. Fight Against Brownsburg*

*Annexation*, 124 N.E.3d 597, 601 (Ind. 2019). Moreover, a judgment is clearly erroneous "if the court applied the 'wrong legal standard to properly found facts.'" *Id.* (quoting *Town of Fortville v. Certain Fortville Annexation Territory Landowners*, 51 N.E.3d 1195, 1198 (Ind. 2016)). In conducting our review, we do not reweigh the evidence or reassess the credibility of the witnesses, and we consider only the evidence and the reasonable inferences that support the judgment. *In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016).[4] If the evidence supports the findings and the findings support the judgment, we affirm. *See id.*

[14] In a termination proceeding, "[a] finding . . . must be based upon clear and convincing evidence." I.C. § 31-37-14-2. To terminate, the court must find

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation

---

[4] In reciting the facts, Father leads with two paragraphs of favorable evidence. We remind counsel of Indiana Appellate Rule 46(A)(6)(b), which specifies that "[t]he facts shall be stated in accordance with the standard of review appropriate to the judgment or order being appealed." We also observe that non-compliance with appellate rules is a ground for appellate waiver. *See, e.g.*, *Pierce v. State*, 29 N.E.3d 1258, 1267-68 (Ind. 2015).

department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2).

[15] Father does not challenge the sufficiency of the evidence supporting the court's finding under subsection (A)(1)—indeed, Father "concede[s] that the evidence presented by . . . DCS regarding the 'removal' statutory element [is] legally sufficient." Br. of Appellant at 13. Furthermore, Father does not challenge the sufficiency of the evidence supporting the court's finding that adoption is a

satisfactory plan under subsection (D). *See, e.g.*, *In re R.L.-P.*, 119 N.E.3d 1098, 1105 (Ind. Ct. App. 2019) ("Generally, adoption is a satisfactory plan."). Father instead focuses on challenging the sufficiency of the evidence supporting findings under subsections (B) and (C). We address those subsections in turn.

## Subsection (B)

[16] Under subsection (B)(i), the court found a reasonable probability that Father would not remedy the conditions that resulted in the Children's placement outside the home, noting that—*inter alia*—Father failed to avoid incarceration.[5] When a court makes a finding under subsection (B)(i), the court must evaluate "the parent's fitness at the time of the termination hearing, 'taking into consideration evidence of changed conditions.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015) (quoting *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014)). Changed conditions might be shown through the parent's response to services. *Id.* Nevertheless, the court is not required to look past habitual patterns of conduct. *See id.* Habitual conduct includes "'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment[.]'" *Id.* (quoting *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*). Ultimately,

---

[5] Father and DCS address subsection (B)(i) and go on to address (B)(ii), discussing whether the continuation of the parent-child relationship would pose a threat to the Children's well-being. Having reviewed the findings, we discern no finding under subsection (B)(ii). Regardless, because subsection (B) is written in the disjunctive, we need only address the sufficiency of the evidence supporting a finding under subsection (B)(i).

in evaluating the likelihood of remedied conditions, a court must balance evidence of "[c]hanged conditions . . . against habitual patterns of conduct to determine whether there is a substantial probability of future neglect." *Id.*

As to the instant finding regarding incarceration, there is evidence that Father was incarcerated when DCS intervened in late 2017. Father was released in July 2018 and he was incarcerated again in September 2018. He was released in February 2019 and, in less than an hour, incarcerated yet again. Although Father points out that he had not been incarcerated for several months when fact-finding concluded, Father was nevertheless on parole and probation and facing pending criminal matters.

We conclude that there is clear and convincing that Father was not likely to remedy his pattern of incarceration, which constitutes sufficient evidence to support the finding under subsection (B)(i). Although the trial court also found that other conditions were not likely to be remedied, we need not address the additional findings. *See In re G.M.*, 71 N.E.3d 898, 907-08 (Ind. Ct. App. 2017) (regarding a finding as surplusage where there were other adequate findings).

## Subsection (C)

The trial court found that termination was in the Children's best interests. "Deciding whether termination is in children's best interests is '[p]erhaps the most difficult determination' the trial court must make." *In re Ma.H.*, 134 N.E.3d 41, 49 (Ind. 2019) (alteration in original) (quoting *In re E.M.*, 4 N.E.3d at 647). The trial court "must look at the totality of the evidence and, in doing

so, subordinate the parents' interests to those of the children." *Id.* "Central among these interests is children's need for permanency"—because "'children cannot wait indefinitely for their parents to work toward preservation or reunification.'" *Id.* (quoting *In re E.M.*, 4 N.E.3d at 648).

[20] Here, the Children were removed from parental care in late 2017. For most of August and September 2018, the Children lived with Father for a trial home visit that was ultimately unsuccessful. Thereafter, the Children were in foster care. As of the conclusion of fact-finding in January 2020, Father had not been incarcerated for several months. However, as earlier discussed, the evidence indicates that Father was habitually incarcerated. He also faced pending criminal matters. Moreover, Father was living in a bedroom in a friend's residence and did not yet have adequate living space to care for the Children.

[21] The foregoing evidence indicates that Father could not immediately care for the Children and that, based on his patterns of conduct, Father would become incarcerated and be unavailable to care for them. Moreover, even assuming that Father had adequate housing and would remain available to parent the Children, Father had unremedied issues with anger. Although Father received services, he struggled to implement anger-management skills. The Children had reported being fearful of Father, leading to the implementation of a "safe word." Father also frightened a caseworker. He engaged in violent, disruptive behavior on several occasions while incarcerated. When Father was released at one point, he was arrested within an hour on allegations of domestic violence. Mother reported a history of domestic violence between them. Moreover,

Father attempted to minimize evidence of his aggressive tendencies, claiming that he was misunderstood because he was not from Indiana. When asked about losing his temper, Father responded: "That's just me." Tr. Vol. 2 at 31.

[22] A caseworker testified that she did not observe a bond—with at least some of the Children not wanting to visit with Father. That caseworker opined that termination was in the Children's best interests. Moreover, the guardian ad litem opined that termination was in the Children's best interests, noting: "I just don't know that [Father] can control that anger that he admits to having. I don't know that it would be a good situation for the [C]hildren." *Id.* at 149.

[23] Father characterizes the testimony about past issues of domestic violence as "unspecified and unsubstantiated concerns." Br. of Appellant at 18. Father largely directs us to favorable evidence, pointing out that he stayed in contact with DCS and service providers, signed paperwork, kept appointments, participated in services, and attended visits. As to the two visits that occurred late in the case, Father attributes the Children's demeanor to grief over the recent loss of Mother. Father asserts that "[a]lmost everything [he] was asked to do to demonstrate compliance he accomplished." Br. of Appellant at 17. He seeks more time to participate in services, prolonging placement in foster care.

[24] Ultimately, we are not at liberty to reweigh the evidence. We conclude that there is clear and convincing evidence supporting the finding of the trial court that terminating Father's parental rights is in the Children's best interests.

[25] Sufficient evidence supports the order terminating Father's parental rights.

Affirmed.

Vaidik, J., and Baker, S.J., concur.