## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 16 2020, 9:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Abigail R. Recker
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of L.S. and K.S. (Minor Children) and J.S. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

June 16, 2020

Court of Appeals Case No. 19A-JT-2693

Appeal from the Orange Circuit Court

The Honorable Steven L. Owen, Judge

Trial Court Cause Nos.
59C01-1903-JT-55
59C01-1903-JT-56

**Mathias, Judge.**

[1] J.S. ("Father") appeals from a judgment of the Orange Circuit Court granting the Indiana Department of Child Services' ("DCS") petition to terminate Father's parental rights to L.S. and K.S. ("the Children"). Father contends that (1) insufficient evidence supports the trial court's findings and (2) the findings do not support the conclusions that lead to the termination of his parental rights to Children. Concluding that the trial court's findings and conclusions are not clearly erroneous, we affirm.

## Facts and Procedural History

[2] DCS became involved with the Children's family in August 2014. The Children—born in April 2008 and December 2009—lived with Mother at the time.[1] Upon receiving a report that Mother was abusing drugs, a DCS employee administered a drug test, which came back positive, and DCS started an informal adjustment with the family. Father was not involved in the informal adjustment. Mother continued abusing drugs, and the Children were removed to their maternal aunt's care on December 19, 2014.

[3] Shortly thereafter, DCS filed a petition alleging the Children were children in need of services ("CHINS") as a result of Mother's drug abuse. At a January 5, 2015, hearing, Parents admitted the Children were CHINS, and the court entered its order declaring the same on February 3. Following a February 19,

---

[1] T.W. ("Mother") voluntarily relinquished her parental rights to Children when she consented to their adoption on August 13, 2019. Tr. p. 30. Accordingly, Mother does not participate in this appeal.

2015, dispositional hearing, the trial court ordered Mother, but not Father, to participate in DCS services. Father was permitted to have visitation with the Children. The permanency plan for the Children at the time was reunification.

[4] Then in May 2015, the trial court authorized Father to have a trial home visit with the Children subject to his submission of clean drug screens; however, Father and his girlfriend tested positive for illegal substances, and the trial home visit never commenced. A review hearing in Children's case took place on October 5, 2015. The trial court authorized the Children's return to Father's care subject to three conditions: that Father submit only clean drug screens, that Father and Children reside at Father's aunt's home, and that Children have no unsupervised contact with Father's girlfriend. Ex. Vol. 1, pp. 94–95; Tr. p. 44. Father tested positive for cocaine on October 5 and October 9. DCS filed a motion for emergency hearing on October 20, alleging that Father had not complied with the trial court's conditions. The trial court denied DCS's motion following a hearing on October 26 but ordered that the Children be removed from Father's care if Father submitted another positive drug screen.

[5] The Children's trial home visit with Father lasted from October 2015 until March 2016, when Father tested positive for illegal drugs. The Children were returned to their maternal aunt's care, where they remained for the duration of these proceedings. Following the Children's removal, Father participated in supervised visitation with the Children through Ireland Home Based Services for approximately eighteen months, from March 2016 until November 2017. The weekly visits lasted four hours and took place at Father's home. The

supervisor described these visits as going "exceptionally well," and Father attended ninety-five out of one hundred visits with Children. Tr. pp. 74, 84. Father, however, submitted numerous positive drug screens for a variety of illegal substances during the period in which he had supervised visitation with Children: in April 2016 for THC; in June 2016 for THC, amphetamine, and methamphetamine; in July 2016 for THC, amphetamine, and methamphetamine; in August 2016 for THC; in October 2016 for THC; and in December 2016 for amphetamine.

[6] Following a dispositional hearing on August 17, 2016, the trial court issued a modified dispositional decree on November 3, 2016, ordering Father to participate in services. Father was to, among other things: refrain from using illegal drugs and engaging in criminal activity; complete a substance abuse assessment and follow all recommendations; submit to random drug and alcohol screens; attend all scheduled visits with the Children; and complete an intensive outpatient treatment program. Father missed various weekly drug screens through much of 2017. Ex. Vol. 2, pp. 243–50; Ex. Vol. 3, pp. 2–4. Father submitted positive drug screens for amphetamine, methamphetamine, and hydrocodone in August 2017, and for methamphetamine and THC in September 2017.

[7] DCS filed a petition to terminate Father's parental rights in October 2017. DCS also assigned Family Case Manager ("FCM") Karen Howson to the family's case at that time, and the court suspended Father's services and supervised

visits with the Children. The permanency plan for the Children was modified from reunification to adoption.

[8] In May 2018, Father was convicted of Class B misdemeanor possession of marijuana. In October 2018, the termination petition was dismissed at DCS's request, and DCS reinstated services for Father, who at that point had not seen the Children for one year. A home-based therapist completed a parenting and family functioning assessment of Father in October. Father admitted to using marijuana in the three months preceding the assessment and to "recent" use of methamphetamine and cocaine. Tr. pp. 92, 111. The therapist found that the Children could have attachment issues with Father and that Father had a high probability of substance use disorder. The therapist recommended that Father continue random drug screens, attend a relapse prevention class, attend a support program such as Narcotics Anonymous, continue with fatherhood engagement services, and learn to bond with the Children.

[9] Following these recommendations, in late 2018, Father participated in but did not complete fatherhood engagement services. Father also completed a substance abuse assessment in November 2018. Based on the results of that assessment, DCS referred Father to a substance use disorder group and directed him to attend individual therapy. Completion required attendance at eight group sessions, and Father attended four. He did not participate in any individual therapy sessions. Father was also referred twice for psychological evaluation but did not complete the evaluation. He did not start an intensive outpatient treatment program that was referred by DCS. FCM Howson had

difficulty reaching Father via telephone and at his home. And in December 2018, Father tested positive for methamphetamine and THC. Father was discharged from the recommended group therapy provider in February 2019 for non-compliance.

[10] DCS filed a second petition to terminate Father's parental rights on March 20, 2019. The Court Appointed Special Advocate ("CASA") filed a report in August 2019 recommending that termination of Father's parental rights and Children's adoption were in Children's best interests. A fact-finding hearing on the petition was held on August 13, 2019. Father was incarcerated on that date for a pending charge of criminal mischief in Orange County. Children had been placed outside of Father's home for fifty of the preceding fifty-five months at the time of the fact-finding hearing. The court entered its order terminating Father's parental rights on October 11, 2019, finding in relevant part:

> 77. Since removal [in March 2016] from Father, Father has failed to demonstrate the ability to maintain sobriety.
>
> 78. Father has cycled through periods of negative screens, and then Father will relapse, using THC and Methamphetamine primarily.
>
> 79. FCM Howson testified credibly that adoption is in the [C]hildren's best interest based on: (1) the lack of progress by Father to address substance use; (2) the amount of time that has passed since Father has visited with the [C]hildren; and (3) [Child]'s Youth Report where she indicates that she does not want to see her Father.

Appellant's App. Vol. 3, p. 108. Father now appeals the termination of his parental rights.

## Discussion and Decision

[11] Parental rights are "precious and protected by our Federal and State constitutions." *In re Adoption of C.B.M.*, 992 N.E.2d 687, 692 (Ind. 2013). Nevertheless, parental rights are not absolute: "termination of parental rights is appropriate when parents are unable or unwilling to meet their parental responsibilities." *In re R.L.-P.*, 119 N.E.3d 1098, 1104 (Ind. Ct. App. 2019).

[12] When DCS seeks to terminate parental rights, it must prove its case by clear and convincing evidence, a heightened burden of proof that reflects the "serious social consequences" of parental rights termination. *In re G.Y.*, 904 N.E.2d 1257, n.1 (Ind. 2009). Decisions to terminate parental rights are among the most fact-sensitive that trial courts are called upon to make. *In re E.M.*, 4 N.E.3d 636, 639 (Ind. 2014).

[13] Accordingly, we review such decisions with great deference in recognition of a trial court's unique position to assess the evidence. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). Our standard of review in parental rights termination cases requires us to consider only the evidence favorable to the judgment below; we do not reweigh the evidence nor judge the credibility of witnesses. *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). Rather, we ask whether the evidence clearly and convincingly supports the trial court's findings, and then whether the findings clearly and convincingly support the

judgment. *K.T.K. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 1225, 1229–30 (Ind. 2013). We will set aside the trial court's findings or judgment only if they demonstrate clear error, or "that which leaves [this Court] with a definite and firm conviction that a mistake has been made." *Z.B. v. Indiana Dep't of Child Servs.*, 108 N.E.3d 895, 900 (Ind. Ct. App. 2018), *trans. denied*.

[14] Thus, before a parent-child relationship may be terminated, DCS must prove by clear and convincing evidence:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> >
> > (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> >
> > (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[15] If the trial court finds the allegations in a petition described in Section 4 of this chapter are true, DCS need not show by clear and convincing evidence that continuation of the parent-child relationship is "wholly inadequate for [a] child's survival." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Rather, clear and convincing evidence that a child's emotional and physical development would be threatened by continuation of the parent-child relationship is sufficient to support an order terminating parental rights. *Id.*

### I. *Whether Sufficient Evidence Supports the Trial Court's Finding*

[16] Father disputes that DCS presented evidence sufficient to support the finding that there existed a "lack of bonding" between the Children and Father.

Appellant's App. Vol. 3, p. 105. A factual finding is clearly erroneous when there are no facts or inferences that may be drawn from the evidence in support of that finding. *In re S.P.H.*, 806 N.E.2d at 879. Here, evidence regarding Father's relationship with Children was presented via the testimony of Emily Clearwater, a therapist employed by Ireland Home Based Services who conducted a parenting and family functioning assessment with Father in October 2018. Tr. p. 87; Ex. Vol. 2, pp. 222–26. Clearwater's assessment was based in part on results from a Parenting Stress Index ("PSI") rating device; Clearwater wrote that the Children's PSI profiles were "invalid due to defensive responding. [Father] appears to be responding in a defensive manner and attempting to look competent and stress free . . . [Father] may be detached and uninvolved in his parenting responsibilities." Ex. Vol. 2, p. 225. Accordingly, Clearwater recommended that Father "learn how to bond with his children. His PSI results indict [*sic*] that there could be attachment issues which could be the result of not seeing his children for so long." *Id.* at 223. During the termination hearing, Clearwater explained that the PSI profile invalidity "either means that there's problems there with [the parent's] attachment to the children, or [the parent is] trying to look stress free, as far as parenting goes." Tr. p. 87.

[17]     Father points to the testimony of former FCM Kimberly Fletcher, who was assigned to the Children's case from mid-2015 to January 2016. Fletcher said that she observed that the Children were bonded with Father, enjoyed visiting him, and "never didn't want to visit with him." Tr. pp. 51–52. Similarly, the testimony of a second therapist from Ireland Home Based Services, who

supervised Father's weekly visits with Children between March and August 2017, was that the visits went exceptionally well, never required her intervention, and that Father was prepared for every visit. Tr. pp. 75–76.

[18] Clearwater expressed her concern about a lack of bond between Father and Children in October 2018, at which time Father's visits with Children had been terminated for approximately one year. And the trial court found that Children had been out of Father's home for fifty of the fifty-five months preceding the termination hearing. From this evidence, the trial court could reasonably infer that there was a basis for Clearwater's concern about a broken parental bond, given the time that had elapsed between the last of Father's supervised visits with Children and the date of his parenting assessment. Thus, the trial court's finding of a "lack of bonding" between Father and Children was not clearly erroneous.

[19] We emphasize, however, that trial courts must articulate the existence of such clear and convincing evidence, where DCS proffers it. *See In re C.M.*, 960 N.E.2d 169, 174 n.6 (Ind. Ct. App. 2011) ("a recitation that a witness testified in a particular way does not equate to a finding of basic fact"), *adhered to on reh'g*, 963 N.E.2d 528. The sole "finding of fact" addressed to Father's bond with Children consists of the trial court's statement that Clearwater "was concerned for lack of bonding between [the Children] with Father." Appellant's App. Vol. 3, p. 105. Simply restating the hearing testimony of a DCS witness as the trial court's own finding of fact, without determining whether the testimony was credible, falls short of a proper finding of basic fact. Furthermore,

articulating that DCS met its burden of proof is especially critical in light of the State's "power to shape the historical events that form the basis for termination" when a child is already in the State's custody. *Tipton v. Marion Cty. Dep't of Public Welfare*, 629 N.E.2d 1262, 1265 (Ind. Ct. App. 1994), *quoting Santosky v. Kramer*, 455 U.S. 745, 763 (1982) (noting in dicta that the State's unusual ability to structure the evidence in termination cases increases the risk of erroneous factfinding).

## II. *Whether the Conditions Leading to Children's Removal Would Not Be Remedied*

[20] Father challenges the trial court's determination relating to Indiana Code section 31-35-2-4(b)(2)(B) (conditions will not be remedied). This subsection is written in the disjunctive, and therefore the trial court needed only to find that one of the three requirements of the subsection had been established by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *trans. denied*. In determining whether there is a reasonable probability that a parent will remedy the conditions which resulted in a child's removal, a trial court engages in a two-step inquiry: first, it identifies the conditions that led to and contributed to the child's continued removal from the parent's home; second, it determines whether there is a reasonable probability that the conditions justifying a child's continued placement outside the home will not be remedied. *In re K.T.K.*, 989 N.E.2d at 1231.

[21] Here, when the Children were initially removed from Mother's care due to her drug use, Father did not live with Mother and the Children. Although Father

"had an open assessment with DCS in Dubois County due to [his] alleged substance abuse," the trial court explicitly found that "Father was not involved with or the cause for [DCS]'s original involvement with the [C]hildren." Appellant's App. Vol. 3, pp. 102, 108. DCS initiated the Children's trial home visit with Father following their removal from Mother's home. The trial home visit lasted approximately five months, until Father violated the conditions of the court's dispositional order by testing positive for illegal drugs. Accordingly, the individual failure of both Parents to maintain sobriety is the condition that led to Children's removal. Thus, it was incumbent upon the trial court to determine whether DCS established, by clear and convincing evidence, a reasonable probability of non-remediation of that condition, as to Father.

[22] Following the end of the trial home visit, Father consistently and successfully attended supervised visitations with Children for a substantial period of time. Father was unable, however, to maintain his sobriety during this time, as evidenced by numerous positive and presumptively positive drug screens. Those supervised visits, too, eventually stopped when DCS filed its first petition to terminate Father's and Mother's parental rights to the Children. Then, after the dismissal of the first petition and reinstatement of DCS services, Father failed to maintain contact with the Family Case Manager assigned to the family's case.

[23] Other conditions that Father was required to meet as part of the trial court's dispositional orders included that Father "[c]omplete a substance abuse assessment and follow all treatments and successfully complete all treatment recommendations developed as a result of the substance use assessment" and

that Father complete an Intensive Outpatient Program (IOP) with a designated provider. Appellant's App. Vol. 3, p. 103. Father followed some treatment recommendations but did not "[take] advantage of the services available to him[.]" *Id.* at 106. Father did not engage in relapse prevention classes; did not attend community support groups such as Narcotics Anonymous; did not seek a sponsor; did not complete a psychological evaluation; and did not attend individual therapy. *Id.* at 105–06. Father readily admitted that he failed to complete these programs and cited his full-time work schedule as hindering his ability to participate. Father also avers that he completed two substance abuse and detox programs, one of which he enrolled in without DCS's referral. Tr. pp. 112, 123. Accordingly, the trial court's findings appear to lead unerringly to the conclusion that DCS established a reasonable probability that Father will not remedy the condition—his use of illegal drugs—which led to the Children's removal.

[24] Father argues the trial court's conclusion was clear error because its findings focused on his past parental shortcomings and failed to analyze evidence of Father's present or future inability to parent the Children. Father cites in support a 2011 decision of this Court that reversed a termination judgment due to the trial court's erroneous focus on a parent's historical conduct and the corresponding absence of "factual findings as to [parent]'s current circumstances or evidence of changed conditions." *In re C.M.*, 960 N.E.2d at 175. In that case, the condition that led to removal was the parent's incarceration and her cohabitation with a drug-dealing boyfriend. In concluding

that the condition had not been remedied, the trial court made no factual findings as to the parent's current fitness based on her circumstances at the time of the termination hearing, which necessarily meant that the trial court failed to consider evidence of changed conditions. Rather, the trial court's judgment was based on findings regarding the parent's mediocre progress with DCS services, while findings regarding her living situation were absent. Furthermore, the trial court failed to make a determination as to the credibility of the parent's testimony regarding her current living circumstances and voluntary participation in substance abuse treatment. In reversing the termination judgment, we wrote: "Mother claimed to have accomplished each of the things required to remedy the prior conditions. . . . Her testimony was not directly contradicted. The trial court made no determination as to whether Mother's testimony was credible or lacking in credibility." *Id.* at 175. Because the trial court in *In re C.M.* failed to analyze whether the condition leading to removal had been remediated, its termination judgment was reversed. *Id.*

[25] Father argues that the trial court here similarly failed to analyze his current ability to parent Children, citing in support his stable living conditions and current employment. We cannot agree, because the condition leading to removal in Father's case was his abuse of illegal substances. The trial court's focus on his subsequent "habitual pattern of conduct" as it related to drug abuse was thus entirely relevant. *See In re K.T.K.*, 989 N.E.2d at 1231. Father does not challenge the numerous findings that detail how, despite the various substance-abuse prevention services DCS recommended, Father returned to abusing

drugs, including during his trial home visit with Children and during the period when he had supervised visits with Children. That Father did not take advantage of treatment services available to him up to the point of the termination hearing was properly considered as a habitual pattern of conduct, indicating that the condition leading to the Children's removal from his care would not be remedied. The trial court's judgment was also based on the finding that a therapist familiar with Father's case "testified credibly that there is little likelihood of Father maintaining sobriety without completion of a treatment program." Appellant's App. Vol. 3, p. 106. And an FCM's recommendation that the Children be adopted was based in part on Father's lack of progress addressing substance abuse, which the trial court also found credible. *Id.* at 107.

[26] Furthermore, at the time of the termination hearing on August 13, 2019, Father was incarcerated in the Orange County Jail for a pending charge of Class B misdemeanor criminal mischief. Previously, Father had been convicted of Class B misdemeanor possession of marijuana.[2] That Father was incarcerated at the time of the termination hearing—though not related to the specific condition which led to Children's removal—does not reflect well on Father's current ability to parent Children; rather, it indicates that Father's conditions may have

---

[2] The trial court found that "Father was incarcerated for brief periods during the pendency of this case." Appellant's App. Vol. 3, p. 106. We fail to identify sufficient evidence supporting that finding in the record; however, Father does not challenge the accuracy of the finding, and the finding does not appear to have served as the basis for the trial court's conclusion, so we limit our comment to that observation.

changed for the worse. Any evidence of changed conditions—or a lack thereof—is relevant to the trial court's determination of a parent's fitness to care for a child at the time of the termination hearing. *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), *trans. denied*.

[27] Based on these findings, the trial court concluded that there was a reasonable probability that the condition which resulted in Children's removal and continued placement outside the home would not be remedied, and our review reveals no error in that conclusion.

### III. Whether Termination was in the Children's Best Interests

[28] Father also challenges the trial court's determination relating to Indiana Code Section 31-35-2-4(b)(2)(C) (best interests of the children). In determining what is in the best interests of the children, the court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.B.*, 887 N.E.2d 158, 167 (Ind. Ct. App. 2008). Nevertheless, a parent's failure to make the changes that DCS has identified as necessary for reunification supports a conclusion that termination is in a child's best interests. *Matter of Ma.H.*, 134 N.E.3d 41, 50 (Ind. 2019). And, we consider a child's need for permanency in acknowledging that children "cannot wait indefinitely for their parents to work toward preservation or reunification." *Id.* at 49 (*quoting In re E.M.*, 4 N.E.3d at 648).

[29] The trial court here acknowledged that determining whether termination is in Children's best interests "necessarily places the children's interest in preserving

the family into conflict with their need for permanency." Appellant's App. Vol. 3, p. 109, *quoting In re E.M.*, 4 N.E.3d at 647. Father contends that the only findings regarding Children's best interests had to do with their current placement with a maternal aunt and correctly notes that a parent's constitutional right to raise a child "may not be terminated solely because there may be a better home available for that child." *In re R.A.*, 19 N.E.3d 313, 321 (Ind. Ct. App. 2014), *trans. denied*.

[30] In this case, Children have had a permanent home with a relative since March 2016; well over three years passed between the end of Children's trial home visit with Father and the August 2019 termination hearing. The Children's need for permanency at this stage thus cannot be discounted. Furthermore, the trial court's judgment was not based solely on the Children's long-term placement outside of Father's care: its findings also included that Father had not made the change—gaining and maintaining sobriety—that DCS identified as a prerequisite to reunification. And the trial court found credible the testimony of an FCM and the CASA that termination of Father's parental rights was in Children's best interests. Appellant's App. Vol. 3, p. 106–07. Where such testimony in support of termination is accompanied by clear and convincing evidence of a parent's failure to remedy the condition which led to removal, the findings support a conclusion that termination is in the child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). Accordingly, there is no clear error in the trial court's judgment that termination of Father's parental rights is in the Children's best interests.

# Conclusion

The trial court did not clearly err in inferring from the evidence that Father and Children may suffer from a lack of bonding. And the trial court's conclusions that the conditions that led to Children's removal would not been remedied and that termination of Father's parental rights was in Children's best interests were clearly and convincingly supported by its findings. Accordingly, we affirm the judgment terminating Father's parental rights to Children.

Affirmed.

Riley, J., and Tavitas, J., concur.